IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| NPCR, INC., d/b/a NEXTEL PARTNERS, | ) | 4:04CV3236 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| ANNE C. BOYLE, in her official capacity as the Commissioner of the Nebraska Public Service Commission, et al., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

This is an appeal of the Nebraska Public Service Commission's (hereinafter, "the Commission") denial of plaintiff NPCR, Inc.'s, d/b/a Nextel Partners' (hereinafter, "Nextel") unopposed application for designation as an eligible telecommunications carrier ("ETC") for certain areas in Nebraska.[1] Filing No. 1. The parties agree that the action should be reviewed on the record made in proceedings before the Commission. Filing No. 15, Stipulation; Filing No. 20, Designated Record ("Desig. R."). Jurisdiction is premised on 28 U.S.C. § 1331.

Nextel Partners is a commercial mobile radio service provider of telecommunications service in Nebraska.[2] The defendants, sued in their official capacities, are duly elected commissioners of the Nebraska Public Service Commission (hereinafter, collectively, "the Commission"). On appeal, Nextel asserts that the Commission's denial contravenes certain provisions of the Telecommunications Act of 1996, 47 U.S.C. §§ 214(e)(2) and

---

[1] Designation as a ETC makes makes a telecommunications company eligible for state and/or federal funding to ensure that all consumers have access to affordable telephone service.

[2] Nextel is a wholly-owned direct subsidiary of Nextel Partners Operating Corporation, which is a wholly-owned direct subsidiary of Nextel Partners, Inc., which is a wholly-owned indirect subsidiary of Sprint Nextel Corporation. *See* Filing No. 31, Corporate Disclosure Statement. Sprint Nextel Corporation is a publicly traded company. *Id.*

253(a) and violates its constitutional rights under 42 U.S.C. § 1983. In response, the Commission argues that the court lacks jurisdiction, that the court should abstain from considering the appeal, that Nextel cannot state a claim under § 1983, and that the Commissioner's decision is supported by substantial evidence.

## I. Background

Nextel serves more than one million subscribers nationwide under the brand name "Nextel." *See* Desig. R. Ex. A, Hearing Transcript ("Hr'g Tr.") at 15-20, 25. A separate publicly-traded entity, Nextel Communications, Inc., serves urban license areas and Nextel Partners typically serves smaller, more rural, license areas. *Id.* at 15-17. Nextel Partners has been issued licenses by the Federal Communication Commission ("FCC") to provide wireless service to various parts of Nebraska. *Id.* at 25-26; Desig. R., Ex. P.

Nextel filed an application to be designated as an ETC under 47 U.S.C. § 214(e) on April 24, 2003. Desig. R., Ex. D at 3-17. Specifically, it requested designation as a federal ETC in certain non-rural telephone company wire centers served by Qwest Communications and in twelve rural telephone company study areas. *Id.* at 6-7. On April 28, 2003, Nextel filed an amended application. *Id.*, Ex. E at 18-27. No protests or interventions were filed and the Commission deemed the application unopposed under Nebraska state law. *Id.,* Ex. S, Order at 1-2.

The Commission held a public hearing on Nextel's application on July 17, 2003. Hr'g Tr. at 1-74. Scott Peabody, a Nextel Engineer, testified in support of Nextel's application. Desig. R., Ex. F, Direct Testimony. At the hearing and in prepared testimony submitted to the commission, Mr. Peabody testified that Nextel's current network provides each of the nine supported services required by the Federal Communications Commission

("FCC") for ETC status. *Id.* at 7-11. He also described Nextel's service technology and existing FCC licenses. *Id.* at 4-5; Hr'g Tr. at 9, 16. He further testified regarding the telecommunications services that Nextel already provides in Nebraska and the various interconnection and resale agreements Nextel has already established. *Id.* at 16-18.

Peabody further testified that the company would commit to provide and advertise the supported services, explicitly stating, "Nextel will meet its obligation as an ETC to provide service throughout these designated areas upon reasonable request." *Id.* at 13; Hr'g Tr. at 19 (agreeing to provide lifeline and E911 services). Mr. Peabody testified that Nextel would provide universal service to consumers using antennae, cell sites, towers, trunk lines, mobile switching centers, and interconnection facilities already in use and that Nextel regularly deploys additional cell sites and channels, as necessary, to maximize signal coverage and service availability. Desig. R., Ex. F at 11.

Peabody also testified that Nextel would bring new and innovative technologies to rural areas that would ordinarily be available only to urban customers to rural areas. Hr'g Tr. at 49. Peabody submitted a coverage map showing Nextel's present and proposed coverage areas. Desig. R, Ex. J; Hr'g Tr. at 50-55. Although Peabody represented that the proposed areas would receive coverage, he did not specify when that would occur. *Id*. at 52-53. Peabody also testified that he anticipated that Nextel, if designated an ETC, would request approximately $5,000 per month from the Federal Universal Service Fund. At the hearing, one of the commissioners acknowledged that wireless carriers present the only real opportunity for competition in rural and high-cost markets. Hr'g Tr. at 41.

The Commission denied Nextel's application on February 10, 2004. Desig. R., Ex. S, Order at 9-10. It found that Nextel "offered only generalized statements that it has the

3

ability to provide the supported services." *Id.* at 4. Acknowledging that under its precedent, "it was not necessary for an ETC to be offering the supported services and advertising the availability and charges of the services prior to ETC designation," it found an ETC must present "sufficient and credible evidence that it [is] willing and capable of meeting the requirements of § 214(e)(2) and [has] every intention of carrying out its plan to provide the supported telecommunications services *throughout the designated area.*" *Id.* at 5 (emphasis in original). Although Nextel's representative had testified that it would "expand deployment of its wireless network as it receives universal service support," the commission found that Nextel had "brought forth no specific evidence of where and when it plans to do so." *Id.* at 8. The Commission found that Nextel had not provided sufficient evidence that it was willing to, and capable of, meeting the core requirements of § 214 (e) and that it had not "presented a clear plan and timetable for providing the supported services throughout the designated territory." *Id.* at 6. The Commission interpreted the language in § 214(e)(2) to mean "that the Commission is only obligated to designate more than one ETC in a given territory served by non-rural carriers." *Id.* Relying on the "[p]lain construction of the phrase 'more than one,'" the Commission concluded that the designation of a second ETC is required upon a finding that the ETC applicant "has satisfied the requirements of the Act and FCC regulations," but that the "designation of a third or fourth ETC in a given territory served by a non-rural carrier is purely discretionary." *Id.*

The Commission also found that Nextel had not shown the designation would be "in the public interest" because it had not shown that its proposed service territory was large enough to prevent 'cherry picking.'" *Id.* at 7. Further, the Commission stated that

4

"the purpose of universal service is not to promote competition." *Id.* at 9. It also found no evidence that Nextel's designation as an ETC would lead to increased competition. *Id.* at 7 ("the goal of competitive neutrality is not automatically met with the designation of an additional ETC in the areas served by rural companies"). Because Nextel was already providing wireless service throughout its licensed territory in Nebraska, the Commission found no evidence that Nextel would "in fact, extend its service or provide better service than presently being offered." *Id.* at 8-9. It noted that providing a subsidy could result in a windfall to Nextel. *Id.* at 7. The Commission also found Nextel "unwilling to submit to some basic state-imposed requirements such as equal access, the filing of tariffs and service quality benchmarks." *Id.* at 9.

The Commission concluded that, "in today's marketplace, we find that the question to be answered is whether subsidizing NPCR's service offering in the proposed Nebraska rural territories is good public policy." *Id.* The Commission stated:

> Looking back to its 2000 *Western Wireless* decision, the Commission finds that perhaps its public interest analysis wasn't rigorous enough and tailored enough to the goals of universal service. To be sure, the Commission was more concerned at that time with bringing competition to the rural areas of Nebraska. Since then, the environment and the Commission's focus has changed. The Commission believes that universal service is not a vehicle by which competition should be artificially created. The purpose of universal service is not to promote competition.

*Id.* at 8-9. Two commissioners dissented, stating that the Nebraska Public Service Commission lacked authority to deny an unopposed ETC application based on any concerns other than the objective criteria set out in the Act and the public interest. *Id.* at 11-12 (referring to depletion of the Universal Service Fund).

Nextel then filed a motion for rehearing, which was not opposed. Desig. R., Ex. T. In support of its motion for rehearing, Nextel argued that it offered unique service offerings,

5

including mobility of service, a local calling area that would include western Iowa as well as eastern Nebraska, no roaming charges, implementation of location-assisted emergency 911 service, short messaging and two-way messaging, walkie-talkie features, and network-wide mobile data services such as email and Web browsing. *Id.* at 13. The evidence shows these services are not currently offered to all rural and insular customers in Nebraska. *Id.* Nextel also demonstrated its commitment to service quality and timely expansion and argued that increased competitive choice would result from its designation. Nextel also addressed the impact its designation would have on the Universal Service Fund, stating that the amount it anticipated receiving from the Universal Service Fund was less than 0.2% of the amount to be distributed to incumbent local carriers in Nebraska, and 0.002% of the total fund. *Id.* at 7.

In addition, Nextel agreed to comply with the voluntary commitments regarding customer service, reporting and extension of facilities approved by the FCC in *In the Matter of Federal-State Joint Board on Universal Service, Virginia Cellular, LLC,* CC Docket No. 96-45, FCC 03-338, 19 F.C.C.R. 1563 (F.C.C. January 22, 2004) ("*Virginia Cellular*") (granting an ETC application and endorsing certain service quality and consumer protection commitments made by a wireless applicant). *Id.* at 3-4. Nextel further committed to filing information detailing its progress toward meeting its build-out plans in the requested service areas annually with the Commission. *Id.* The Commission denied Nextel's motion for rehearing on May 11, 2004. Desig. R., Ex. X, Order at 1-2. Two commissioners again dissented. *Id.* at 3-4. There is no pending state proceeding involving the Public Service Commission's decision.

**II.  DISCUSSION**

    A.  Jurisdictional Issues

The doctrine of sovereign immunity precludes suit against a sovereign "if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration . . . or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620 (1963) (citations omitted).  "In determining whether the doctrine of *Ex Parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (*quoting Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)).  The doctrine of *Ex Parte Young* permits a telecommunications company to bring a federal suit for declaratory and injunctive relief against individual commissioners in their official capacities.  *Id.*  The Eleventh Amendment does not prohibit the granting of all "affirmative" relief; it only prohibits an award of compensatory pecuniary damages for a past violation. *Id.* at 645-46 (approving injunctive relief in the form of an order restraining state officials from enforcing an order in contravention of controlling federal law).

Federal courts should not enjoin pending state criminal prosecutions, except in extraordinary circumstances, based on traditional principles of equity, comity, and federalism.  *Younger v. Harris*, 401 U.S. 37, 44 (1971).  The *Younger* doctrine extends to noncriminal state court proceedings, including administrative proceedings, if:  1) there is an ongoing state judicial proceeding; 2) important state interests are implicated; and 3) there is an adequate opportunity to raise constitutional challenges in the state proceedings.

*Alleghany Corp. V. McCartney*, 896 F.2d 1138, 1142 (8th Cir. 1990). "Abstention is an extraordinary and narrow exception to the virtually unflagging obligation of federal courts to exercise the jurisdiction given them." *In re Otter Tail Power Co.,* 116 F.3d 1207, 1215 (8th Cir. 1997). *Younger* abstention is inapplicable in the absence of an ongoing state proceeding. *In re Burns & Wilcox, Ltd.*, 54 F.3d 475, 478 (8th Cir. 1995).

Under 42 U.S.C. § 1983, suits to enforce individual rights under federal statutes as well as the Constitution are authorized. *City of Rancho Palos Verdes v. Abrams,* 544 U.S. 113, 119 (2005). However, "section 1983 does not provide an avenue for relief every time a state actor violates a federal law." *Id.* Accordingly, to sustain a § 1983 action, a plaintiff must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs. *Id.* at 119-20. Assuming it does, the critical question is whether Congress meant the judicial remedy expressly authorized in a federal statute to coexist with an alternative remedy available in a § 1983 action. *Id.* at 120-121. The burden is on the state to rebut the presumption that § 1983 provides an express, private means of redress by showing that Congress has "specifically foreclosed a remedy under § 1983" either expressly "or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* at 119.

"The existence of a more restrictive private remedy for statutory violations has been the dividing line between those cases in which [the Supreme Court has] held that an action would lie under § 1983 and those in which [it has] held that it would not." *Id.* at 120. The alternative judicial remedy Congress provided in the Telecommunications Act precludes a § 1983 cause of action. *Id.* at 122 (finding that the private remedy provided by the Telecommunications Act is more restrictive than those available through a § 1983 action

8

in that the enforcement mechanism provided by the Act limits relief in ways that § 1983 does not).

        B.   Standard of Review

Title 47, Section 252(e)(6) of the United States Code provides for federal court review of state commission decisions. *Qwest Corp. v. Minnesota Public Utils. Comm'n*, 427 F.3d 1061, 1064 (8th Cir. 2005). "[T]here is no doubt . . . that if the federal courts believe a state commission is not regulating in accordance with federal policy they may bring it to heel." *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378 n.6 (1999). Federal courts review state commission orders under the Telecommunications Act *de novo*. *Qwest Corp.*, 427 F.3d at 1064. The arbitrary and capricious standard applies when reviewing a state commission's findings of fact, but whether an agency acts within its statutory authority is a question of law to be reviewed *de novo*. *Id*. A state commission's interpretation of federal law is entitled to no deference. *Iowa Network Servs., Inc. v. Quest Corp.*, 363 F.3d 683, 692 (8th Cir. 2004).

The arbitrary and capricious standard is the same as the substantial evidence standard. *Ace Tel. Ass'n v. Koppendrayer*, 432 F.3d 876, 880 (8th Cir. 2005). A Commission's factual findings, and the reasonable inferences drawn therefrom, will be upheld as long as they are supported by substantial evidence in the record as a whole. *Id*. Generally, an agency decision will be found arbitrary and capricious if "the agency had relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v.*

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Further, the state commission's decision must be consistent with the Act, and must not substantially prevent implementation of the purposes of the Act. *Michigan Bell Tel. Co. v. Strand*, 305 F.3d 580, 586-87 (6th Cir. 2002).

   C. Telecommunications Act

The Telecommunications Act of 1996, 47 U.S.C. § 151 *et seq.*, was enacted "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." *Qwest Corp. v. FCC*, 258 F.3d 1191, 1196 (10th Cir. 2001). Affordable, quality telecommunications service for all Americans is referred to as "universal service" and includes, among other services, local telephone service and access to emergency, directory-assistance, and long-distance services. 47 U.S.C. § 254(c); 47 C.F.R. § 54.101. In order to make universal service available to all users, including customers in rural, insular, and high-cost areas, the Act provides a funding mechanism under which every interstate telecommunications carrier contributes to a federal Universal Service Fund ("the fund"). 47 U.S.C. § 254(d) & (e). Support from the fund is available to telephone companies who are designated eligible telecommunications carriers ("ETCs") in an area where rural or low-income customers are served. 47 U.S.C. §§ 254(e) & 214(e).

The Act prescribes a procedure for the designation of ETCs. 47 U.S.C. § 214(e). Congress has delegated the authority to grant ETC designations to state commissions. 47 U.S.C. § 214(e)(2). Also, the FCC has authority to consider such designations when a state commission either lacks jurisdiction or has refused to act. 47 U.S.C. § 214(e)(6).

In Nebraska, the Nebraska Public Service Commission has the authority to grant ETC designations. *See* Neb. Rev. Stat. § 86-1406, Nebraska Telecommunication Universal Service Fund Act.

The designated services that the FCC requires an ETC to provide include: 1) voice grade access to the public switched network; 2) local usage; 3) dual tone multi-frequency signaling; 4) single-party service; 5) access to emergency services; 6) access to operator services; 7) access to interexchange services; 8) access to directory assistance; and 8) toll limitation for qualifying low-income consumers. 47 C.F.R. § 54.101. The requirements for ETC designation in a requested service area are met if the applicant: 1) is a common carrier; 2) offers each of these designated services; and 3) will advertise its services. 47 U.S.C. § 214(e).

Both the FCC and state commissions must base their policies concerning preservation and advancement of universal service on the following principles: 1) availability of quality services at just, reasonable, and affordable rates; 2) provision of access to advanced telecommunications and information services in all regions of the nation; 3) provision of access to telecommunications and information services that are reasonably comparable to those services provided in urban areas at rates that are reasonably comparable to rates charged for similar services in urban areas, to consumers in all regions of the nation, including low-income consumers and those in rural, insular, and high cost areas. 47 U.S.C. § 254(b)(1)-(b)(3). State commissions, however, are not prohibited from imposing additional requirements on carriers otherwise eligible to receive Universal Service Fund support. *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393,

418 (1999).  Any such additional requirements must be imposed on a competitively neutral basis and must be consistent with § 254 of the Act.  47 U.S.C. § 253(a) & (b).

The Universal Service Funds can only be used "for the provision, maintenance, and upgrading of facilities and services" in a specific service area.   47 U.S.C. § 254(e); 47 C.F.R. §§ 54.313 & 54.314.  A "service area" is the geographic area established by a state commission where the ETC is required to comply with universal service obligations and is eligible to receive universal service support.  47 U.S.C. § 214(e)(5).  Generally, in an area served by a rural telephone company, "service area" will be a rural company's "study area," the area used by the FCC to determine support for rural telephone companies.  47 U.S.C. § 214(e)(5).

Creamskimming refers to the practice of targeting the customers that are the least expensive to serve. *See In the Matter of Federal-State Joint Board on Universal Service (Western Wireless Corp.*), 16 F.C.C.R. 18133, 18140 (F.C.C. Oct 5, 2001) ("Western Wireless Order").  Comparing population density inside the area proposed to be served to the population density outside the area proposed to be served is a useful proxy in making creamskimming determinations.  *See In the Matter of Federal-State Joint Board on Universal Service, Report and Order,* 20 F.C.C.R. 6371, 6389 (F.C.C. March 17, 2005) ("FCC ETC Order") (examining the potential for creamskimming effects only in instances where an ETC applicant seeks designation below the study area level of a rural incumbent LEC).  A commitment to serve the entire study area of each rural telephone company identified in its application will generally obviate the risk of "cherry-picking" or "creamskimming."  *See In the Matter of Federal-State Joint Board on Universal Service*, 12 F.C.C.R. 8776, 8881 (F.C.C. May 8, 1997) ("Universal Service Order") (holding that if

competitors, as a condition of eligibility, must provide services throughout a rural telephone company's study area, the competitors will not be able to target only the customers that are the least expensive to serve).

The Act provides state commissions with the primary responsibility for performing ETC designations.  47 U.S.C. § 214(e)(2).  Under § 214(e)(6), the commission may, with respect to an area served by a rural telephone company, and shall, in all other cases, designate more than one common carrier as an ETC for a designated service area, consistent with the public interest, convenience, and necessity, as long as the requesting carrier meets the requirements of § 214(e)(1).  47 U.S.C. § 214 (e)(6).  Under 47 U.S.C. § 214(e), a state commission may also designate additional applicants in areas served by a *rural* telephone company, if the designation is additionally shown to be "in the public interest."  *Id.*

In 2004, the FCC clarified the factors to be considered in making the "in the public interest" determination for rural carriers.  *Virginia Cellular,* 19 F.C.C.R. at 1565.  The FCC considers five factors to determine if a designation is "in the public interest."  *Id.* at 1565-77.  The FCC weighs numerous factors, including:  1) the benefits of increased competitive choice; 2) the unique advantages and disadvantages of the competitor's service offering; 3) the impact of multiple designations on the Universal Service Fund; 4) the competitor's commitments to quality of telephone service; and 5) the competitor's ability to provide the supported services throughout the requested service areas within a reasonable time frame. *Id.* at 1565; *see also In the Matter of Federal-State Joint Board on Universal Service (Highland Cellular, Inc.),*19 F.C.C.R. 6422, 6424 (F.C.C. April 12, 2004) ("Highland Cellular").  The FCC also endorses an applicant's specific service-extension and service-

quality commitments, including its adoption of the *CTIA Consumer Code for Wireless Service* ("CTIA Code") (which sets out certain principles, disclosures, and practices for the provision of wireless service) and an applicant's agreement to report the number of consumer complaints it receives each year to the FCC. *Virginia Cellular,* 19 F.C.C.R. at 1576-77.[3]

The FCC recognizes that an ETC's capital improvement plans must necessarily evolve over time as the carrier responds to consumer demand. *See In the Matter of Federal-State Joint Board on Universal Service, NPCR, Inc., d/b/a Nextel Partners*, 19 F.C.C.R. 16530, 16534 n.31 (F.C.C. August 25, 2004) ("Nextel Multi-State Order").* "The FCC has long recognized that increased competition between a wireless and wireline carrier will encourage both carriers to deploy new facilities and technologies and improve their networks to remain competitive." *Id.* at 16539. With respect to wireless services, the FCC has observed that "the mobility of telecommunications assists consumers in rural areas who often must drive significant distances to places of employment, stores, schools, and other critical community locations" and that "[i]n addition, the availability of a wireless universal service offering provides access to emergency services that can mitigate the

---

[3]Before *Virginia Cellular,* an applicant was only required to reasonably demonstrate its capability and commitment to provide the supported services upon designation. *See In the Matter of Federal-State Joint Board on Universal Service, Western Wireless Corp.,* CC Docket 96-45, 15 F.C.C.R. 15168, 15178 (August 10, 2000) ("South Dakota Preemption Order"). Under that case, a carrier could satisfy the requirement in a number of ways: 1) a description of the proposed service technology, as supported by appropriate submissions; 2) a demonstration of the extent to which the carrier may otherwise be providing telecommunications services within the state; 3) a description of the extent to which the carrier has entered into interconnection and resale agreements; or, 4) a sworn affidavit signed by a representative of the carrier to ensure compliance with the obligation to offer and advertise the supported services. *Id.* Also, the South Dakota Preemption Order established that requiring an applicant to provide the supported services prior to ETC designation would create an unlawful barrier to entry. *Id.* at 15173. An ETC was only required to make the same commitment as the incumbent local carrier makes to its customers, "to extend its network to serve all customers within its service areas upon reasonable request." *Id.* at 15175.

unique risks of geographic isolation associated with living in rural communities." *Virginia Cellular*, 19 F.C.C.R. at 1576.

In *In re Application of GCC License Corp. (Western Wireless),* 647 N.W.2d 45, 54-55 (Neb. 2002) ("*Western Wireless"*), the Nebraska Supreme Court determined that the "public interest" analysis should: 1) examine the applicant's proposed service area to determine if it has been fashioned to be large and diverse enough to prevent cherry-picking; and 2) consider the additional consumer benefits offered by the applicant, including, in particular, such things as increased consumer choice, expanded calling areas, and the benefits of mobility that can be provided by a wireless carrier. *See Western Wireless,* 264 N.W.2d at 50. Further, the "public interest requirement . . . is not meant as a protective barrier for rural telephone companies but rather as a method for ensuring that rural areas receive the same benefits from competition as their urban neighbors." *Id.* at 54 (noting that "[t]he policy of Congress in creating a public interest requirement was to favor competition"). The court rejected the argument that rural telephone companies cannot survive competition from wireless providers. *Id.* at 53. Further, the court held that "Section 214(e) requires a carrier seeking ETC status to demonstrate that it will 'offer' services required under 47 U.S.C. 254(c)." *Id.* at 55 (noting the burden is "to show only that they are capable of offering or providing the required services"). Thus, although a carrier designated as an ETC is eligible to receive universal service support, that status does not make federal funding automatic–if a carrier wishes to receive subsidies, it must follow through on its intentions. *Id.*

In 2005, the Nebraska Public Service Commission adopted Interim Guidelines on eligible ETC standards. *See In re Establish an Interim Policy on Eligible Telecomm. Carrier*

*Standards,* Application No. C-3415, 2005 WL 2006661, *2-*4 (Neb. P.S.C. June 28, 2005). The Interim Guidelines were designed to provide clarity for carriers seeking ETC designation in Nebraska and were intended to mirror the FCC Guidelines. *See In re Northeast Colorado Cellular, Inc., d/b/a Viaero Wireless*, App. No. C-3324, 2005 WL 3872505, * 9 (Neb. P.S.C. Oct. 18, 2005) (referring to FCC ETC Order, 20 F.C.C.R. 6371).

### III. ANALYSIS

#### A. Threshold Issues

The court must first address the Commission's jurisdictional challenges and its assertion that Nextel's claim for deprivation of civil rights is subject to dismissal. The court first finds that the action is not barred by the doctrine of sovereign immunity. Suits against the commissioners, in their official capacities, for declaratory and injunctive relief are allowed under the doctrine of *Ex Parte Young*. This is an action for injunctive relief. An order compelling the Commission to act would not result in any pecuniary loss to the state treasury. Accordingly, the action is not barred by sovereign immunity. In view of this finding, the court need not address the argument that the state has waived its immunity. *See, e.g., Verizon*, 535 U.S. at 645 (declining to address issue); *MCI Telecomm. Corp. v. Pub. Serv. Comm'n of Utah*, 216 F.3d 929 (10th Cir. 2000) (holding that a state commission waived its immunity from suit by arbitrating an interconnection dispute pursuant to Section 252 of the Act).

The Commission's reliance on abstention as a ground for dismissal is similarly unfounded. There is no pending state proceeding. The availability of state court review under the Administrative Procedure Act, Neb. Rev. Stat. § 75-136 (2003), does not preclude concurrent federal court jurisdiction. Moreover, the designation of an ETC under the Telecommunications Act involves federal law and invokes important federal, as well as

16

state, interests. The Universal Service Fund is a federal program governed by federal law. Abstention in this case is not proper.

The court finds, however, that Nextel's § 1983 claim is subject to dismissal. The comprehensive remedial scheme provided under the Telecommunications Act supplants remedies under § 1983. *See Rancho Palos Verdes,* 544 U.S. at 119. Accordingly, Nextel may not seek relief under 42 U.S.C. § 1983.

### B. The Merits

On review of the record, the court finds that Nextel reasonably demonstrated its capability and commitment to provide the supported services required under the Act. The evidence of Nextel's capability and commitment was similar to that presented to the Commission by another wireless provider to whom the Commission granted ETC status in 2002. *See Western Wireless,* 264 N.W.2d at 50-54 (approving ETC "public interest" test applied by the Commission). The record also shows that Nextel satisfied the "public interest" test for designation as an ETC in a rural service area as that standard was defined at the time. The Commission's findings to the contrary are not supported by substantial evidence on the record as a whole and thus are arbitrary and capricious. Further, the court finds the Commission erred as a matter of law with respect to its finding that promoting competition plays a limited role under the Act, as well as in its discussion of "cherry-picking" concerns.

The fact that no rural telephone companies opposed Nextel's application supports the inference that Nextel's designation would be in the public interest. The Commission's reliance on the potential harm to incumbent local carriers and depletion of the fund was improper. The Commission did not balance the perceived or potential harm to incumbent local carriers and the fund against the competitive benefit to consumers, and the innovation

17

that would result from Nextel's designation. Further, the evidence showed that the potential impact on the fund would be minimal. In focusing on potential effects on local incumbents and the fund, the Commission erroneously ignored undisputed evidence of the consumer benefits that would result from the designation of Nextel as an ETC.

The record does not support a finding that designation of Nextel as an ETC is contrary to the public interest. It is clear that Nextel would provide unique service offerings to rural consumers and an increased level of competition. Nextel's designation would not spark cherry-picking concerns since Nextel proposed to provide service throughout the service area.

The Commission also erred in interpreting § 214(e)(2) to mean that the designation of a second ETC is required upon a finding that the ETC applicant "has satisfied the requirements of the Act and FCC regulations," but that the "designation of a third or fourth ETC in a given territory served by a nonrural carrier is purely discretionary." Under that interpretation, the Commission would be free to grant or deny ETC applications without reference to any standards. There is no authority for the proposition, nor does it satisfy a reasonable regulatory scheme.

There is nothing in the Act that gives state public service commissions unfettered discretion with respect to Universal Service Fund designations. Words in a regulatory statute take their meaning from the purposes of the regulatory legislation. *NAACP v. Federal Power Comm'n*, 425 U.S. 662, 669 (1976) (stating "the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare"). The statute sets out standards to be applied in making ETC designations. One of those standards is "the public interest," and, though the term may be vague, state

commissions are not free to ignore legislative intent and judicial precedent in interpreting the phrase. Compliance with such precedent ensures that the standards will be consistently applied.

The Commission's interpretation would result in the standardless and inconsistent application of the law that essentially amounts to the definition of "arbitrary and capricious." Moreover, the interpretation would carry the potential for abuse, favoritism, and conflicts of interest. Because the court reverses the Commission under 47 U.S.C. § 214(e), it need not address Nextel's contentions with respect to 47 U.S.C. § 253(a).

## IV. CONCLUSION

Since this action was filed, both the FCC and the Nebraska Public Service commission have clarified the requirements for ETC status. In addition, the ownership of Nextel has changed as the result of a merger with Sprint. In light of those changed circumstances, it will be appropriate for the Commission to reconsider Nextel's application. Accordingly, the decision of the Nebraska Public Service Commission will be reversed and its order on Nextel's application will be vacated. This action will be remanded for proceedings consistent with this opinion. A Judgment in conformity with this Memorandum Opinion will issue this date.

DATED this 5th day of December, 2006.

BY THE COURT:

s/ Joseph F. Bataillon
Chief United States District Judge